UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ALFONSO DISTEFANO,

                    Plaintiff,

        -against-

CARLOYN W. COLVIN,

                    Defendant.

-------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 20 2017 ★
BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-4945 (CBA)

**AMON, United States District Judge:**

Plaintiff Alfonso DiStefano ("Plaintiff") commenced this action pursuant to Title II of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final determination by the Commissioner ("Commissioner" or "Defendant") of the Social Security Administration ("SSA") denying his May 9, 2012 application for Social Security Disability Benefits. (See D.E. # 1 ("Compl.").) Both parties have moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff seeks an order reversing the Commissioner's determination that he is not disabled, and remanding for reconsideration of the agency decision. The Commissioner defends the agency decision and seeks dismissal of the Complaint. For the reasons set forth below, the Court concludes that the Administrative Law Judge ("ALJ") made numerous legal errors and that the ALJ's decision was not supported by substantial evidence. Plaintiff's motion is granted and the case is remanded for further administrative proceedings consistent with this Memorandum and Order.

# BACKGROUND

## I.    Procedural History

Plaintiff retired due to disability as a sergeant from the New York City Police Department in November 2011. (D.E. # 7 ("Administrative Record" or "R.") at 50, 446–451.) On May 9, 2012, Plaintiff filed an application for Social Security disability benefits, claiming that he has been disabled since November 29, 2011 due to the following conditions: a torn rotator cuff resulting in a reattached bicep tendon; a dislocated clavicle; herniated and bulging discs; sleep apnea; asthma; chronic sinusitis; atrial fibrillation; weakness; loss of motion; instability; tingling; numbness; shortness of breath; loss of function; fatigue; and difficulty sitting, standing, and walking. (Id. at 138, 154.) On August 13, 2012, the SSA denied Plaintiff's application, finding that his condition had "stabilized" and that he could still perform work that would be less physically demanding than his former police work and that would not require more than occasionally lifting or carrying of up to 10 pounds. (Id. at 82, 86.) Thereafter, on August 20, 2012, Plaintiff requested a hearing before an ALJ. (Id. at 96.) On January 7, 2014, Plaintiff appeared with counsel Nicholas Cifuni before ALJ Patrick Kilgannon, who briefly examined Plaintiff and also questioned the vocational expert, Michael Smith ("VE"). (Id. at 46–72, 133–35.) On May 28, 2014, the ALJ issued his decision finding that Plaintiff was not disabled during the relevant period, but rather that he retained that capacity to perform "less than sedentary work." (Id. at 26–40.) The ALJ also found that, per the vocational expert, sufficient jobs exist in the national and regional economy for someone of Plaintiff's background and residual functional capacity ("RFC"). (Id.) Plaintiff appealed the ALJ's decision to the SSA Appeals Council on June 9, 2014, (id. 7–23), and the Appeals Council denied review on June 26, 2015, finding "no reason under [its] rules to review the Administrative

2

Law Judge's decision" and thereby rendering the ALJ's ruling final, (id. at 1). The instant civil action was timely commenced on August 21, 2015. (See Compl.)

## II. Relevant Medical Evidence

Plaintiff supports his applications for disability benefits with medical evidence regarding various ailments from numerous medical professionals, which are well chronicled in the ALJ's opinion and in both parties' briefs. Because this Court's ruling is based primarily on the ALJ's consideration of Plaintiff's shoulder and lower back problems, these are the facts that are recited below.

### A. Pre-Alleged Disability Onset

Plaintiff injured his left shoulder and ankle on July 21, 2010 when executing an arrest. (R. at 447.) He saw Dr. Ludwig Licciardi, to whom he complained of pain, paresthesia, and numbness in his left hand. (Id. at 430–31.) Physical examination revealed limited abduction in his left shoulder, significant weakness in his left arm, and an audible popping sound when the shoulder was moved from an abducted to a forward flexing position. (Id.) Plaintiff also complained of pain and tenderness on his biceps tendon and along his triceps down to the elbow, and in the levator scaphoid and rhomboids muscles of the left shoulder. (Id.) Plaintiff had a slightly positive straight-leg raise on the left, and that ankle was very tender. (Id.) Dr. Licciardi found left shoulder dislocation subluxation and separation of the acromioclavicular ("AC") joint; a possible rotator-cuff tear or labral tear of the left shoulder; triceps tendonitis and early evidence of nerve entrapment; a left-ankle tear of the talofibular ligament; and a possible mild malleolar fracture. (Id.)

An MRI of the left shoulder taken on July 24, 2010 revealed evidence of a partial tear of the rotator cuff, impingement of the AC joint, and labral tearing with a posterior superior labral

lesion involving the biceps tendon. (Id. at 429, 441.) Plaintiff returned to Dr. Licciardi on August 5, 2010, who noted continued pain and recommended that Plaintiff undergo physical therapy on his shoulder and ankle two to three times a week for the next month to restore his range of motion and to prevent atrophy. (Id. at 429.)

Plaintiff undertook physical therapy with James Cardello three times a week from August 26, 2010 to November 3, 2010; however, the treatment was ineffective and so on November 8, 2010, Dr. Andrew Rokito performed arthroscopic surgery on Plaintiff's left shoulder. (Id. at 361–62, 433–34, 442.) After surgery, Plaintiff returned to physical therapy three times per week from November 22, 2010 to June 3, 2011. (Id. at 444.) Plaintiff "progressed slowly" with physical therapy, and by the conclusion his pain was 10/10 at its worst and 4/10 at its best. (Id.) His physical therapist opined that Plaintiff was unable to resume his police work. (Id.)

A March 17, 2011 computerized tomography ("CT") scan performed on Plaintiff's left-upper extremity to examine his sternoclavicular ("SC") joint instability revealed degenerative changes at the articulation of the left-first rib and sternum but no acute fracture or dislocation. (Id. at 435.) A May 13, 2011 left-shoulder MRI showed no evidence of post-surgery complications or acute fracture or osteonecrosis, but it did note degenerative-type tearing of the glenoid labrum which were compatible with a Buford complex as well as moderate to severe osteoarthrosis of the AC joint, possibly superimposed on an element of distal clavicular osteolysis. (Id. at 436–37.)

On May 21, 2011, Plaintiff was seen by Dr. Young W. Kwon for consultation. Dr. Kwon reported that some of Plaintiff's pain had improved through physical therapy, but that residual symptoms along with "snapping and instability" of the left SC joint remained. (Id. at 501.) Plaintiff rated his resting pain as a 5/10, which increased with activity. (Id.) Examination found that the left SC joint dislocated with a snap with rotation and abduction, and that the area was

4

tender to palpitation. (Id.) Dr. Kwon recommended open medial clavicle excision to help improve the pain and snapping, though he noted that some instability may remain. (Id.)

### B. Post-Alleged Disability Onset

Plaintiff was primarily treated for his shoulder and back pain by Dr. James Guariglia (a chiropractor), Dr. Perry Drucker, and Dr. Kenneth Chapman. As part of his disability application, Plaintiff was also examined by consultative physicians Dr. Lamberto Flores and Dr. Chitoor Govindaraj. Finally, Dr. Jack LeBeau reviewed Plaintiff's file in order to provide to the ALJ his opinion of Plaintiff's RFC.

### 1. Dr. Drucker

Plaintiff first saw Dr. Drucker, a physical medicine and rehabilitation specialist, on March 7, 2012, complaining of left shoulder pain and lower back pain that radiated to his left thigh. (Id. at 250–53.) He denied any significant cervical pain or upper extremity pain, and noted no difficulty with fine motor or coordination activities. (Id.) Upon examination, Dr. Drucker noted moderate SC and AC joint tenderness with moderate subacromial bursa region tenderness on the left shoulder. (Id.) Upper extremity muscle strength was 4+ to 5-/5 proximally and 5- to 5/5 distally. (Id.) A lumbar examination demonstrated negative spinal tenderness, but found L3-S1 paraspinal spasm and tenderness, moderate on the left, mild to moderate on the right, with few isolated trigger points on the left and mild left sciatic notch tenderness. (Id.) Dr. Drucker further found positive straight-leg raise and LaSague test on the left with decreased range of motion and decreased light touch and pinprick sensation in the L3-L4 dermatomes on the left. (Id.) Plaintiff's lower-extremity muscle strength was 5/5, he had good heel-to-toe gait pattern, he was able to get on and off the examining table without any significant difficulty, and had only mild difficulty going from a supine position to a prone position to a supine position. (Id.) Dr. Drucker recommended tri-weekly

physical therapy sessions. (Id.) Plaintiff's symptoms were largely unchanged at an April 23, 2012 follow-up. (Id. at 250–52.)

Plaintiff returned to Dr. Drucker on March 23, 2012 for an electromyography ("EMG"), which documented membrane instability/denervation potentials of the left vastus medialis, left anterior tibialis, and left L3/4 and L4/5 paraspinals, which demonstrated increased large-amplitude/long-duration polyphasic potential with minimal effort. (Id. at 267–68.) The left anterior tibialis also demonstrated a neuropathy firing rate. Dr. Drucker found these results consistent with a chronic/active L3/4 radiculopathy on the left. (Id.)

Dr. Drucker completed a narrative report on December 12, 2013. (Id. at 524–27.) Dr. Drucker indicated that his office had been treating Plaintiff every four to six weeks since his initial visit in March 2012, for his lower-back, leg, and left- shoulder pain. (Id.) He added that Plaintiff has used various medications to treat his pain—including Neurontin, Zanaflex, Tramadol, and Vicodin—but that they provide only "transient relief" and that Plaintiff is adamantly opposed to an epidural and has avoided electroacupuncture for financial reasons. (Id.) A physical examination found tenderness in Plaintiff's left shoulder; reduced forward flexion, extension, and abduction but normal adduction; internal and external rotation at 3/4 of the normal limit; muscle strength of 4+ to 5-/5 proximally and 5/5 distally to the left; and negative Adson's, Drop Arm, and hyperabduction. (Id.) A lumbar examination disclosed negative spinal tenderness, negative sacroiliac ("SI") joint tenderness, negative Ganseslen's, and negative sciatic notch bilaterally. (Id.) There was, however, L2-S1 paraspinal spasm and tenderness, moderate on the right, mild to moderate on the left, with isolated trigger points, right greater than left. (Id.) There was positive straight-leg raise and LaSague on the right, and reduced range of motion of the L/S spine, which Dr. Drucker noted was a modest decline from Plaintiff's prior evaluation. (Id.) Plaintiff still

demonstrated decreased light touch and pinprick in the L3/4 dermatomes on the left, as well as the right anterior lateral thigh. Lower extremity muscle strength remained 5/5 proximally and distally, with no lower-extremity muscle wasting or atrophy. (Id.) Dr. Drucker noted Plaintiff's November 19, 2012 MRI demonstrating L/S spine degenerative disc disease, L3/4 and L4/5 with facet hypertrophy and mild-to-moderate lumbar stenosis, as well as a mild disc bulge at L2/3. Dr. Drucker concluded, in his "medical opinion with a good deal of medical certainty," that Plaintiff "is presently totally disabled and unable to partake in any significant gainful employment including sedentary activity secondary to his limited sitting tolerance," and that this condition is permanent. (Id.) He added that Plaintiff also continues to experience "mild residual weakness" in his left shoulder. (Id.)

Dr. Drucker also filled out an RFC, concluding that Plaintiff could stand/walk less than two hours per day; sit less than four hours per day; occasionally lift/carry more than five but less than ten pounds; and frequently lift/carry less than five pounds. (Id. at 522–23.) He opined that Plaintiff requires frequent breaks during the work day, suffers from pain that prevents him from performing eight hours of work in a day, and requires medications that interfere with his ability to function in the work setting. (Id.) Dr. Drucker supported his RFC determination with specific reference to Plaintiff's above-mentioned November 19, 2012 MRI; to a December 5, 2012 EMG showing an active-right and chronic-active-left L3/4 radiculopathy; and to Plaintiff's shoulder surgery. (Id.)

### 2. Dr. Chapman

In March 8, 2012, Plaintiff visited the offices of Dr. Kenneth Chapman, who is board certified in Pain Management and Anesthesiology, for treatment of Plaintiff's shoulder and lower-back pain. (Id. at 410–11.) Plaintiff appears to have been evaluated by Dr. Chapman's physician's

assistant ("PA"), Kristy Lubak. (Id.) On examination, his gait was normal and his muscle strength was 5/5, but there was tenderness/palpable paraspinal muscle spasm in the lower back and decreased range of motion of the lumbar spine. (Id.) Straight-leg raising was negative. (Id.) There was tenderness over the left shoulder, clavicle, and AC joint. (Id.) Plaintiff was diagnosed with lumbar-disc disorder without myelopathy, lumbar radiculopathy, and shoulder pain. (Id.) Plaintiff was informed that his condition was likely chronic, and Dr. Chapman recommended Plaintiff use nonsteroidal anti-inflammatory drug ("NSAID") and muscle relaxant medications (he was prescribed Zanaflex and a Flector patch), which should not be mixed with alcohol or used while operating motor vehicles, due to their sedative effect. (Id.) Dr. Chapman also offered Plaintiff injections that might provide intermittent relief, but Plaintiff rejected the injections. (Id.)

Plaintiff returned to Dr. Chapman in May and June 2012. (Id. at 406–09.) His physical examination and diagnosis were unchanged, but Dr. Chapman added Tramadol and Relafen to Plaintiff's prescription anyways. (Id.) Plaintiff returned on August 2, 2012, and seems to have had his physical examination administered by Dr. Chapman's PA. (See id. at 568–69.) The evaluation showed lumbar paraspinal tenderness but a negative straight-leg raise and 5/5 strength bilaterally. (Id.) Plaintiff was offered and rejected a lumbar transforaminal epidural steroid injection, which he was informed carried the risk of bleeding, infection, nerve injury, no pain relief, or even increased pain. (Id.) Plaintiff was told to continue physical therapy and was prescribed additional Zanaflex, Tramadol, and Relafen. (Id.)

Plaintiff next saw Dr. Chapman on December 2, 2013. (Id. at 565.) The evaluation performed by his PA noted that Plaintiff appeared uncomfortable or in pain, but found a normal gait, sensations intact to light touch, and a negative straight-leg raise. (Id.) Plaintiff's lumbar range of motion was somewhat decreased, and there was palpable paraspinal muscle spasm

bilaterally. There was tenderness along the AC joint and decreased range of motion in the shoulder. (Id.) That same day, Dr. Chapman issued an RFC in which he determined that Plaintiff was able to stand or walk for less than two hours in an eight-hour work day, sit for less than four hours, occasionally lift and carry five to ten pounds and frequently lift and carry less than five pounds. (Id.) Dr. Chapman concluded that Plaintiff requires frequent breaks during the day, that his pain prevents him from working for eight hours in a day, that he would have difficulty concentrating at work, that he would require more than two sick days per month, and that his medications would interfere with his ability to work. (Id. at 520–21.) Dr. Chapman relied on Plaintiff's February 22, 2012 MRI and articulated clinical findings of chronic and persistent shoulder, lumbar, and leg pain. (Id. at 521.)

On December 18, 2013, Dr. Chapman issued a narrative report based on his treatment of Plaintiff, his review of Plaintiff's 2012 MRI, and his physical examination of Plaintiff. (Id. at 562.) Dr. Chapman's examination found that Plaintiff's range of motion was decreased and that his lumbar and lower back were tender with palpable paraspinal muscle spasms. (Id.) He found that Plaintiff had a positive straight-leg raise on the right side, decreased sensation to light touch bilaterally at L5/S1 dermatomes, but muscle strength of 5/5 for all groups tested. (Id. at 562–63.) He further noted decreased shoulder range of motion and palpable tenderness of the left shoulder capsule, clavicle, and AC joint. (Id. at 563.) Dr. Chapman assessed that Plaintiff's "shoulder, low back, and lumbar radicular pain are permanent and he has reached his maximum medical improvement." (Id. at 564.) Dr. Chapman also opined that Plaintiff "was at risk of developing further degeneration of his shoulder and low back and worsening pain." (Id.) He further determined that Plaintiff "cannot use his upper extremities for fine work or gross motor work[,] . . . cannot sit for more than 20 minutes and . . . cannot stand for more than 20 minutes at a time

without having to change position for a period of time without pain." (Id.) Dr. Chapman concluded that Plaintiff "is unable to work a meaningful job secondary to these disabilities and i[s] totally permanently disabled." (Id.)

### 3. Dr. Guariglia

Plaintiff visited Dr. Guariglia, a chiropractor, for physical therapy twice per week from January 2012 to June 2012 and continued regular visits through at least December 2013. (Id. at 343–47.) Plaintiff complained of pain in his neck, lower back, and right leg; lower-back spasms; shoulder pain and stiffness; and decreased left-arm strength. (Id.) In June 2012, Dr. Guariglia performed a physical examination on Plaintiff, finding cervical- and lumbar-spine palpation tenderness and muscle rigidity, positive cervical foraminal compression test, positive depression test on the left shoulder, positive LaSague straight-leg raise on the right, positive Kemp's test on the right, and cervical- and lumbar-spine range-of-motion limitations on all planes. (Id.) He found no significant abnormality in Plaintiff's gait. (Id.) Dr. Guariglia diagnosed Plaintiff with sciatica and cervical vertebrogenic radiculitis and opined that, due to the lingering nature of his condition and its severity, Plaintiff's prognosis was poor. (Id.) Dr. Guariglia asserted that Plaintiff could lift and carry ten pounds frequently; stand/walk up to six hours a day; sit up to six hours a day; and push/pull in a limited manner. (Id. at 343–47.) Dr. Guariglia completed a narrative report on December 30, 2013. He detailed his exam findings that Plaintiff had tenderness and muscle rigidity in his cervical spine, "much lumbar spine palpation tenderness and muscle rigidity," limited cervical and lumbar range of motion, and positive LaSague and Kemp tests on the right. (Id. at 593.) He also noted spinal misalignments at C4-5, C5-6, L4-5, and L5-S1, but found Plaintiff's reflexes to be equal and active. (Id.) He concluded that Plaintiff's subjective complaints

parallel his objective findings on examination and reiterated that the prognosis remained poor. (Id. at 593–94.)

### 4. Dr. Flores

At the request of the SSA, Dr. Flores performed a consultative exam on Plaintiff on July 11, 2012. (See id. at 78, 399.) Dr. Flores noted the existence of an MRI but found that he did not have the results to review. (Id.) His physical examination revealed reduced range of motion and tenderness of the left shoulder; tenderness and reduced spinal range of motion, as well as a positive straight-leg raise; and normal hand dexterity and fine manipulation. (Id. at 402.) He found no sensory loss and normal gait and posture, and noted that Plaintiff had no difficulty getting onto the examination table. (Id. at 403.) However, Plaintiff had difficulty walking on his toes and had limited ability to squat and bend. (Id.) Dr. Flores determined Plaintiff's prognosis to be "fair" and limited his workplace activities to those that did not involve "raising [his] left upper extremity above [his] head, fully squatting, bending, [and] toe walking." (Id.) Dr. Flores also found Plaintiff to be limited in his ability to engage in "prolonged walking, sitting, standing, climbing stairs, and heavy lifting." (Id.)

### 5. Dr. Govindaraj

Plaintiff was examined by Dr. Govindaraj on February 4, 2014, also at the behest of the SSA. Dr. Govindaraj noted Plaintiff's medical and surgical history—including his shoulder injury—asserting that Plaintiff declined a surgery recommended by Dr. Drucker and that he "does a lot of walking." (Id. at 619–20.) Dr. Govindaraj's physical examination of Plaintiff showed no tenderness or restrictions of the spine, "essentially normal" range of motion of the back, no muscle spasm, normal reflexes, negative straight-leg raise, and normal gait. (Id. at 621–22.) Dr. Govindaraj found that Plaintiff had no "restriction in sitting, standing, walking . . . [or] driving"

and that he was "not being treated with any appropriate therapy," and he concluded that Plaintiff's "overall medical prognosis is good." (Id. at 622.) He attached an RFC finding that Plaintiff could lift or carry up to ten pounds frequently and up to twenty pounds occasionally; sit, stand, and walk eight hours at a time without interruption and eight hours total in a day; frequently reach overhead, handle, finger, feel, and push/pull with both hands; continuously operate foot controls with both feet; occasionally climb stairs and ramps; climb ladders or scaffolds; balance, stoop, kneel, crouch, and crawl; occasionally be exposed to unprotected heights and extreme cold and heat; frequently be exposed to moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, and vibrations; frequently operate a motor vehicle; and be exposed to loud or very loud noise. (Id. at 623–27.) In reaching these conclusions, Dr. Govindaraj appears neither to have examined or considered Plaintiff's shoulder issues, nor to have reviewed or relied upon any of the then-existing objective medical evidence concerning Plaintiff's conditions, such as magnetic resonance imaging ("MRI") or EMGs.

### 6. Dr. LeBeau

Dr. LeBeau, who is board certified in internal medicine and cardiology, was enlisted by the ALJ to render his independent medical opinion concerning Plaintiff's disability. (Id. at 630.) Dr. LeBeau never examined Plaintiff. Based only on his review of Plaintiff's records—the completeness of which is not readily apparent—Dr. LeBeau answered an interrogatory on March 29, 2014 in which he initially found that the evidence supported, among other things, "tendon damage to the left shoulder," "apparent sublation of the left SC joint," and "L3/4 radiculopathy." (Id. at 643.) Dr. LeBeau was uncertain whether Plaintiff's injuries met the Listing of Impairments, but found that Plaintiff suffered a "significant injury to his shoulder," which precluded him from continuing his police work. (Id. at 644.) Dr. LeBeau continued, however, that Plaintiff "is a

powerful man and could do other types of work." (Id.) Dr. LeBeau requested additional information regarding Plaintiff's heart condition before reaching a final disability conclusion. (Id.) But based on his preliminary review, he concluded that Plaintiff's "[p]hysical strength is good," (id.), and completed an RFC finding that Plaintiff could continuously lift up to twenty pounds; occasionally lift and carry up to fifty pounds; continuously carry up to ten pounds; frequently carry up to twenty pounds; sit, stand, and walk for two hours without interruption; sit eight hours per day; stand six hours per day; walk four hours per day; continuously reach, handle, finger, feel, and push/pull with his right hand; frequently reach overhead, and continuously reach, handle, finger, feel, and push/pull with his left hand; continuously operate foot controls with both feet; continuously climb stairs and ramps; occasionally climb ladders and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; frequently move mechanical parts and be exposed to humidity and wetness; continuously operate a motor vehicle; and be exposed to dust, fumes, pulmonary irritants, extreme heat and cold, vibrations, and loud noise, (id. at 646–51.) He further found that Plaintiff was not restricted in performing any of the activities enumerated in the RFC form. (Id. at 651.) Dr. LeBeau did not identify what medical or clinical findings supported his RFC determinations.

After receiving additional information from the ALJ—including a cervical spine MRI— Dr. LeBeau submitted a revised interrogatory on April 25, 2014, in which he concluded that the records "state repeatedly that neurological examination is normal, strength is good, and symmetrical and that no other abnormalities of the extremities are noted. Thus no orthopedic or neurological listings are met." (Id. at 659.) He revised his RFC to state that Plaintiff could walk for only one hour without interruption, sit for seven hours per day, stand for four hours per day, and walk for two hours per day, continuously reach overhead with both hands, occasionally climb stairs and ramps, never climb ladders and scaffolds, occasionally move mechanical parts, and

frequently operate a motor vehicle. (Id. at 661–65.) Dr. LeBeau does not articulate the reasons behind these changes in his RFC or what new information caused the revisions, and the RFC again does not identify what medical or clinical findings supported the RFC conclusions.

## STANDARD OF REVIEW

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); see also 42 U.S.C. § 405(g) ("The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

This deferential standard of review does not apply, however, to the ALJ's legal conclusions. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003). "[W]here an error of law has been made that might have affected the disposition of the case," the court will not defer to the ALJ's determination. Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v.

Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). Rather, an ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Id. (quoting Townley, 748 F.2d at 112). Legal error may include failure to adhere to the applicable regulations. See Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009).

## DISCUSSION

Plaintiff contends that the ALJ improperly rejected the opinion of Plaintiff's treating physicians in making his determination and that the ALJ instead placed undue reliance upon the conclusions reached by Dr. LeBeau, who had been retained by SSA to opine on Plaintiff's condition and who had never examined Plaintiff. (Pl. Mem. at 22). The ALJ also appeared to rely heavily on the opinions of Dr. Govindaraj, who examined Plaintiff only once and who gave no indication that he had reviewed any of Plaintiff's MRIs or EMGs.

"A treating physician's statement that the claimant is disabled cannot itself be determinative." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting Snell, 177 F.3d at 133); see also Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); see Matta v. Astrue, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique

position to make a complete and accurate diagnosis of his patient." (quoting <u>Mongeur</u>, 722 F.2d at 1039 n.2); <u>Veino</u>, 312 F.3d at 588 (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; <u>Bailey v. Astrue</u>, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." <u>Green-Younger</u>, 335 F.3d at 107 (quoting <u>Flanery v. Chater</u>, 112 F.3d 346, 350 (8th Cir. 1997)).

The ALJ in this case gave "little weight" to the opinions of both Drs. Drucker and Chapman that Plaintiff was unable to work. Although the ALJ noted correctly that the ultimate determination of disability is reserved for the Commissioner, (R. at 38 (citing SSR 96-5p)), the ALJ's rejection of Plaintiff's treating physicians' opinions regarding the nature and severity of his impairment was in error. The ALJ rejected their conclusions based on his finding that they are "simply unsupported by the objective medical evidence." (<u>Id.</u>) However, the record shows that their conclusions found ample support. Indeed, the ALJ notes that the record supports the conclusion that Plaintiff had reduced range of motion in his lower back and left shoulder, paraspinal tenderness, and "a few trigger points." (<u>Id.</u>) The ALJ also notes that the record also demonstrates positive straight leg raising and diminished sensation (though noting that this "is not consistently shown throughout the record").[1] Nonetheless, the ALJ rejects the finding of disability because he asserts that the

---

[1] This finding, though technically correct, misstates the weight of the evidence in the record. Of the various physicians who performed the straight-leg raise test, all but one of them (Dr. Govindaraj) found that Plaintiff tested positive. They are Dr. Licciardi (R. at 430), Dr. Drucker (<u>id.</u> at 253, 528), Guariglia (a chiropractor, <u>id.</u> at 343, 593), Dr. Flores (<u>id.</u> at 402), and Dr. Chapman (<u>id.</u> at 561). Dr. Chapman's PA also found on various occasions that Plaintiff tested negative.

record also shows that Plaintiff has a normal gait and full strength, no spinal tenderness,[2] and "only mildly limited" left-shoulder range of motion, which the ALJ took to contra-indicate the treating physicians' opinions regarding Plaintiff's disability. (Id.)

The ALJ's conclusions regarding Plaintiff's treating physicians' opinions thus appear to be based less on the fact that their conclusions find no support in the record, for plainly they are well supported, but instead on those aspects of the record that the ALJ deemed to be inconsistent with their opinions. Likewise, it appears that the ALJ found the treating physicians' conclusions to be inconsistent with the opinions of the consulting experts, Drs. LeBeau and Govindaraj. However, by considering in passing the substantial evidence that supported and was consistent with the treating physicians' conclusions, and instead relying upon his own interpretation of what symptoms must accompany a diagnosis of disability, the ALJ erred. See Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) (remanding where "the ALJ improperly substituted her own criteria as to what is necessary to establish a fibromyalgia diagnosis without support from medical testimony" and ordering the ALJ to "rely on the medical criteria that the treating physician found to support [the] diagnosis" and not to "substitute her own opinion as to the proper diagnostic criteria"). Moreover, the ALJ further erred by articulating his rejection of the treating physicians' opinions as based upon a *lack* of evidentiary support, but relying instead on alleged *inconsistencies* with other evidence in the record. Finally, even assuming the ALJ were correct not to give controlling weight to the treating physicians' opinions, he would have erred by failing to consider the relevant factors in determining how much weight the opinions should have been afforded.

---

[2] This conclusion, however, is contradicted by the ALJ's own finding just one page prior that a consultative examination with Dr. Flores showed "tenderness in [Plaintiff's] spine." (R. at 37.)

## I. Treating Physician's Opinions Were "Well-Supported"

MRIs and EMGs are objective evidence, as are medical signs diagnosed using "medically acceptable clinical diagnostic techniques." Newsome v. Astrue, 817 F. Supp. 2d 111, 128 (E.D.N.Y. 2011) (quoting 20 C.F.R. §§ 404.1528(b) and (c)). Both Drs. Drucker and Chapman explicitly cited to such objective evidence when making their RFC determinations.

### A. Dr. Chapman

Dr. Chapman's RFC noted Plaintiff's February 2012 MRI identifying disc bulges of the lumbar spine and bone spurs. (R. at 521). Considering the painkillers that Dr. Chapman had prescribed to Plaintiff, including Tramadol, Ultram, and Zanaflex, Dr. Chapman indicated that Plaintiff was taking "medications that interfere with his ability to function in the work setting." (Id.) His narrative assessment added further objective clinical support to his conclusions, including a physical examination of Plaintiff. Dr. Chapman noted the February 2012 MRI's findings of abutment of the exiting left L5 nerve root, positive straight-leg raise on the right side, decreased sensation to touch bilaterally at L5/S1, tenderness of the lower back, and palpable paraspinal muscle spasm. (Id. at 562–63.) Dr. Chapman further identifies tenderness in Plaintiff's left shoulder capsule, clavicle, and AC joint, and range of motion limitations of the lumbar and shoulder. (Id.) Based on these findings—as well as his history of treating Plaintiff's shoulder and back pain from March 2012 to August 2012—Dr. Chapman assessed that Plaintiff's "shoulder, low back, and lumbar radicular pain are permanent and he has reached his maximum medical improvement" and opined that Plaintiff "was at risk of developing further degeneration of his shoulder and low back and worsening pain." (Id. at 564.) Dr. Chapman also concluded that Plaintiff "cannot lift more than 10 [pounds] or carry anything more than 10 [pounds], he cannot use his upper extremities for fine work or gross motor work . . . cannot sit for more than 20 minutes

and he cannot stand for more than 20 minutes at a time without having to change position for a period of time without pain." (Id.)

Apart from the alleged inconsistency between Dr. Chapman's findings and the rest of the record, the ALJ also rejected Dr. Chapman's opinions for two additional reasons. The first is that, before examining Plaintiff in December 2013 incident to reaching his RFC conclusion, Dr. Chapman had last seen Plaintiff over a year prior, in August 2012. (Id. at 36.) Second, the ALJ found that Dr. Chapman's "own physical examination" revealed certain findings—such as a normal gait, 5/5 strength, negative Gaenslen's Test, negative Patrick's Test, negative straight leg raise, and intact sensation to light touch in all dermatomes bilaterally—that the ALJ appears to conclude are inconsistent with Dr. Chapman's finding of disability. Neither of these bases are sufficient to support giving "little weight" to Dr. Chapman's opinion. Even if the gap in treatment undermines a finding that Dr. Chapman is a "treating physician," it alone is no reason to reject a physician's opinion. Indeed, the ALJ here gave "great weight" to Dr. Govindaraj, who only examined Plaintiff once. If a single exam is sufficient to afford a physician's opinion "great weight," then the fact that Dr. Chapman's final exam came over a year after his numerous previous exams cannot be a basis for affording that final exam any less weight than Dr. Govindaraj's exam.

Regarding the allegedly inconsistent findings in Dr. Chapman's exam, the ALJ impermissibly interposes his interpretation of Plaintiff's ailments with those of the physicians. As noted above, there was certainly sufficient objective evidence to support Dr. Chapman's opinion. Moreover, the ALJ appears to misread the record. Although Plaintiff was examined on December 2, 2013 by Dr. Chapman's PA, who reported the findings that the ALJ recounts, (R. at 566–67), Dr. Chapman's narrative report of December 18, 2013 recounts different physical exam findings, (see id. at 562–64). For instance, Dr. Chapman notes a positive straight leg test on the right side,

decreased sensation to light touch at the bilateral L5/S1 dermatomes, and substantially reduced range of motion in the lumbar. (Id. at 563.) Accordingly, his conclusions were supported by consistent diagnostic findings. See also Mongeur, 722 F.2d at 1039 n.2 ("[T]he diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician.").

Moreover, an "ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to afford to a treating physician's opinion." Nusraty v. Colvin, No. 15-CV-2018 (MKB), 2016 WL 5477588, at *12 (E.D.N.Y. Sept. 29, 2016) (citing Burgess, 537 F.3d at 129). To the extent that the ALJ had questions about the provenance of these results noted by Dr. Chapman or found them to be inconsistent with his PA's notes, the ALJ had a duty to further develop the record. Failure to do so before assigning "little weight" to Dr. Chapman's opinion was error and warrants remand. See, e.g., Lopez v. Comm'r of Soc. Sec., 622 F. App'x 59, 60–61 (2d Cir. 2015) (stating that "[b]efore rejecting" the treating physician's opinion because it was not supported by the record, the ALJ should have further developed the record by obtaining a more detailed opinion from the treating physician); Ahisar v. Comm'r of Soc. Sec., No. 14-CV-4134 (PKC), 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." (quoting Correale–Englehart v. Astrue, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010))); Vazquez v. Comm'r of Soc. Sec., No. 14-CV-6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[W]here a treating physician's opinion is 'out of sync with the treating notes, the ALJ [does] not have the luxury of terminating his inquiry at that stage in the analysis.' Rather, the ALJ must further develop the record to 'fill any clear

gaps' and resolve the inconsistency." (internal citations omitted) (quoting <u>Hidalgo v. Colvin</u>, No. 12-CV-9009 (LTS), 2014 WL 2884018, at *19 (S.D.N.Y. June 25, 2014))).

### B. Dr. Drucker

Dr. Drucker likewise relied on objective evidence to support his RFC conclusions, including his review of diagnostic tests as well as his own physical examinations and experience with Plaintiff over a nearly two-year period during which Plaintiff was re-assessed every four to six weeks. (<u>Id.</u> at 524.) His December 11, 2013 RFC noted a November 2012 MRI showing L/S spine degenerative disc disease, L3/4 and L4/5 with facet hypertrophy and mild-to-moderate lumbar stenosis, and a mild disc bulge at L2/3. (<u>Id.</u> at 523.) He noted an EMG from December 2012 demonstrating an "active right / chronic left L3/L4 radiculopathy." (<u>Id.</u>) Dr. Drucker wrote a narrative report on December 12, 2013, in which he described the results of his physical exam of Plaintiff. He found mild tenderness and limited range of motion on Plaintiff's left shoulder, (<u>id.</u> at 525); lumbar paraspinal tenderness at L2/S1 with few isolated trigger points, mostly on the right side; and positive straight-leg raise and LaSague test on the right. (<u>Id.</u>) He further found a decreased range of motion in the L/S spine, which he noted was a "modest decline" from Plaintiff's previous evaluation. (<u>Id.</u> at 525–26.) He also noted decreased light touch and pinprick sensitivity in the L3/4 dermatomes on the left as well as the right anterior lateral thigh. (<u>Id.</u> at 526.) His RFC concluded that Plaintiff can stand/walk less than two hours per day; sit less than four hours per day; lift/carry less than ten pounds occasionally and less than five pounds frequently, and that Plaintiff requires frequent breaks, suffers from pain which prevents him from working a full day, and takes medication that would interfere with his ability to function in the work setting. (<u>Id.</u> at 520–21, 526–27.) Dr. Drucker explained that he had been treating Plaintiff for his chronic lower-back pain for two years and that, in Dr. Drucker's "medical opinion with a good deal of medical

certainty," Plaintiff's pain and "limited sitting tolerance" precluded him from engaging in even sedentary work. (Id. at 527.) These conclusions were supported by Dr. Drucker's extensive findings and long history of treating Plaintiff, and so were not, as the ALJ concluded, "simply unsupported by the objective medical evidence." (Id. at 38.)

## II.    The Inconsistent Evidence Is Not "Substantial"

Although the treating physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, Schisler v. Sullivan, 3 F.3d 563, 567–68 (2d Cir. 1993), the treating physician's findings need not be given controlling weight if they are inconsistent with other substantial evidence in the record, including—when appropriate—the opinions of other medical experts. Burgess, 537 F.3d at 128 (finding that a treating physician's opinion is not controlling when other substantial evidence in the record contradicts it); 20 C.F.R. § 404.1527(d)(2). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw, 221 F.3d at 131. However, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. Accordingly, the opinion of a consultative physician, "who only examined a Plaintiff once, should not be accorded the same weight as the opinion of [a] Plaintiff's treating [physician]." Anderson v. Astrue, No. 07-CV-4969 (DLI), 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009). "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" Id. (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)).

The opinions proffered by Drs. LeBeau and Govindaraj do not suffice as "substantial evidence" under this Circuit's standard and are inadequate to override Plaintiff's treating

physicians' opinions or to support the ALJ's RFC determination. The ALJ accorded Dr. LeBeau "great weight" because he is board certified in internal medicine and cardiology, and because the ALJ considered Dr. LeBeau's opinions—save for his conclusions regarding how much Plaintiff can lift or use his left arm—to be "consistent with the objective medical evidence." (R. at 38.) The ALJ also afforded "great weight" to Dr. Govindaraj because his opinions "are based on clinical findings, and they are consistent with the objective medical evidence in the record," although likewise assigned "little weight" to Dr. Govindaraj's opinion regarding Plaintiff's left arm. (Id.) The ALJ did not identify, however, what specific evidence or clinical findings caused him to accept these experts' opinions as more consistent with the record than the opinions of Plaintiff's treating physicians. Snell, 177 F.3d at 134 (holding that Commissioner must "explain why a treating physician's opinions are not being credited"). As discussed below, such reliance on these two consultative opinions was in error.[3]

## A. Dr. LeBeau

Dr. LeBeau never examined Plaintiff, but instead reached his conclusions regarding Plaintiff's RFC based on his purported "review of the entire medical record." (R. at 38.) However, medical reports that are not based on personal observation "deserve little weight in the overall evaluation of disability." Vargas v. Sullivan, 898 F.2d 293, 295–96 (2d Cir. 1990); see also Filocomo v. Chater, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) (holding that reliance on RFC

---

[3] The ALJ stated generally that "the consultative examiners are given great weight because they are based on clinical findings." (R. at 38.) To the extent that the ALJ intended by this conclusory statement to accord great weight to Dr. Flores' opinion, without any further discussion of Dr. Flores' findings, this too was in error. Indeed, in the SSA's initial RFC determination (after which Plaintiff sought a hearing before the ALJ), the Commissioner concluded that Dr. Flores' opinions that Plaintiff was "limited in raising the left upper extremity above the head, fully squatting, bending, toe walking and . . . limited in prolonged walking, sitting, standing, climbing stairs, and heavy lifting," (id. at 403), were "too vague to translate into usual RFC terms." (Id. at 78.) It is well established that a consulting expert's opinion is "not substantial" and thus is insufficient to undermine the opinion of a treating physician when it is "couched in terms 'so vague as to render it useless in evaluating' the claimant's residual functional capacity." Burgess, 537 F.3d at 129 (quoting Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)).

assessment "completed by a doctor who never physically examined Plaintiff" would be "unfounded, as the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight"). Moreover, even if an examiner's review of the entire record were a sufficient reason for according his opinions "great weight," Dr. LeBeau's conclusions regarding Plaintiff's capabilities would belie the accuracy of his review and undermine the ultimate findings in his RFC. Dr. LeBeau's review of Plaintiff's record appeared largely centered on Plaintiff's heart health, of which Plaintiff complains, but which is not the primary basis for his disability claim. Cf. Green-Younger, 335 F.3d at 107–08 (finding conclusion of consulting physician not "substantial" when based on consideration other than that which claimant complained of). He notes that, in his view, the records sent to him "state repeatedly that neurological examination is normal," (R. at 659), despite the fact that he appears to have been referring specifically to the results of Plaintiff's April 1, 2014 MRI of the cervical spine—a radiological, rather than neurological finding—which revealed spondylosis with disc space narrowing at C4/5 (which also exhibited a right foraminal herniated disc with right foraminal narrowing), C5/6, and C6/7 (which also exhibited a bulge of the disc and endplate hypertrophic changes), (id. at 652). He notes Plaintiff's L3/4 radiculopathy, but fails to note Plaintiff's 2012 diagnosis of cervical vertebrogenic radiculitis, which is supported by his 2014 cervical MRI, (id. at 343); the February 2012 MRI showing a postrerior annular bulge at L5/S1, with left foraminal extension and narrowing and abutment of the exiting left L5 nerve root, (id. at 350); or the November 19, 2012 MRI showing facet hypertrophy and mild-to-moderate lumbar stenosis at L3/4 and L4/5, (id. at 526, 594). He further notes that the record does not state whether Plaintiff is right- or left-hand dominant, (id. at 662), even though his own prior RFC indicated that Plaintiff is right-

hand dominant, (id. at 648), and this fact is repeated throughout the record, (see, e.g., id. at 180, 250, 399, 527, 619).

Dr. LeBeau's resulting RFC opines that Plaintiff can continuously carry up to ten pounds, frequently carry up to twenty pounds, and occasionally carry up to fifty pounds. (Id. at 661.) He further found that Plaintiff could continuously reach overhead with his left hand.[4] (Id. at 662.) As is made clear by the ALJ's rejection of these portions of Dr. LeBeau RFC, the ALJ's conclusions indicate that Dr. LeBeau was unaware of the severity of Plaintiff's shoulder injury and undermine the ALJ's contention that Dr. LeBeau reviewed the entire record. Moreover, Dr. LeBeau's RFC was unaccompanied by any reference to medical or clinical findings to support his various conclusions, as the RFC form requires. (Id. at 660–65.) Because Dr. LeBeau failed to account for one of Plaintiff's most serious injuries and primary complaints—and because his interrogatory responses highlight gaps in his review of the record—his ultimate RFC opinion is unreliable and cannot be salvaged merely by according little weight to the finding most clearly attributable to the error. Given Dr. LeBeau's obvious failure to consider Plaintiff's shoulder injury—and, accordingly, the pain or complications associated therewith—in determining the RFC, his conclusions throughout the RFC are suspect and the ALJ erred by relying upon them. See, e.g., Burgess, 537 F.3d at 130–31 (finding that ALJ erred by relying upon the opinion of an expert who failed to examine a key piece of evidence in the record); Skupien v. Colvin, No. 13-CV-403 (WMS), 2014 WL 3533425, at *4 (W.D.N.Y. July 16, 2014) (finding that where a consulting examiner's "no restrictions" opinion is "inconsistent with his examination findings" the "ALJ was

---

[4] Dr. LeBeau's initial RFC also found that Plaintiff could occasionally climb ladders and scaffolds and occasionally be exposed to unprotected heights. (R. at 626–27.) In his revised RFC, Dr. LeBeau concluded that Plaintiff can never climb ladders and scaffolds or be exposed to unprotected heights, but because he does not indicate what particular medical or clinical findings he relied upon in making this alteration, the Court is unable to determine the basis for his conclusions. The ALJ should have sought "clarification and additional information from [Dr. LeBeau], as needed," to fill the gap before rejecting his opinion. Ahisar, 2015 WL 5719710, at *12.

required to reconcile the inconsistency or, if he could not do so, seek clarification" from the examiner).[5]

### B. Dr. Govindaraj

Dr. Govindaraj examined Plaintiff once on February 4, 2014. His findings misstate Plaintiff's medical record and are at odds with the vast majority of the evidence in the record. For instance, he notes that Plaintiff "drives" and "does a lot of walking," and that Plaintiff had declined Dr. Drucker's recommendation that he pursue surgery for his back pain. (R. at 620.) The ALJ relied specifically on some of these findings to determine that Plaintiff's allegation of disability were not credible. (Id. at 38.) However, Dr. Drucker never recommended that Plaintiff undergo back surgery; at most, Dr. Drucker noted that Dr. Kwon had considered Plaintiff a candidate for follow-up *shoulder* surgery. (See id. at 552.) Moreover, Dr. Govindaraj's claim that Plaintiff walks a lot is at odds with Plaintiff's repeated complaint throughout the record that his pain is aggravated by walking for extended periods of time. (See, e.g., id. at 77, 154, 172, 180, 259, 343, 400, 561, 570, 572, 593.) Nor did Dr. Govindaraj appear to review the entire medical record, because there is no indication that he considered Plaintiff's MRIs or other existing objective medical evidence that would have been crucial to determining the extent of Plaintiff's injuries. Finally, Dr. Govindaraj's clinical findings differ substantially from every other set of exam results contained in the record, including those of Plaintiff's treating physicians. Selig v. Richardson, 379 F. Supp. 594, 601 (E.D.N.Y. 1974) ("[O]nce it is determined that an impairment exists, the opinions of the treating physician are entitled to substantially greater weight than the impressions

---

[5] Indeed, there is only one other part of the medical record which acknowledges that Plaintiff suffered from a shoulder injury in the past but concluded that this injury no longer limited his physical abilities and that the entire neurological examination is "normal": Dr. Govindaraj's single examination of the Plaintiff. See Green-Younger, 335 F.3d at 108 (finding conclusion of consulting physician not "substantial" when apparently based entirely on "one-shot" evaluation reporting inconsistent results).

of a doctor who sees the claimant only once, especially where [the treating physician] has treated the claimant over a substantial period of time." (internal citation omitted)). Most notably, he is the only examining physician to find that Plaintiff's straight-leg test was normal and, although noting past trauma to Plaintiff's shoulder, seemingly failed to examine it and opined that Plaintiff faced no special restrictions in its use.[6] (R. at 619–28.) Like Dr. LeBeau's conclusions, Dr. Govindaraj's RFC determinations were unsupported by reference to medical or clinical findings, and the ALJ in his decision did not identify which of Dr. Govindaraj's findings the ALJ found to be consistent with the record or to support Dr. Govindaraj's conclusions. The ALJ's cursory scrutiny of the examining experts' findings and conclusions, compared to his second guessing of Plaintiff's treating physicians' opinions, is lopsided and warrants remand.

### III. Weight Afforded to Treating Physicians

Even if a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive. See 20 C.F.R. § 404.1527(d)(2). Among other factors, the ALJ must consider (1) "the frequency of examination and the length, nature and extent of the treatment relationship," (2) "the evidence in support of the opinion," (3) "the opinion's consistency with the record as a whole," and (4) "whether the opinion is from a specialist." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). In general, "the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." Burgess, 537 F.3d at 129 (quoting 20 C.F.R.

---

[6] After recounting Plaintiff's various maladies, the treatment for which are well documented in the record, Dr. Govindaraj enigmatically added that Plaintiff "is not being treated with any appropriate therapy." (R. at 622.) This contradicts the ALJ's determination—which he relied upon in part to find that Plaintiff was not disabled—that Plaintiff suffers from "sleep apnea, asthma, cardiac conditions, and gastrointestinal problems but those seem to be under control" by virtue of, among other things, Plaintiff's stent placement and use of a continuous positive airway pressure ("CPAP") machine. (Id. at 38–39.)

§ 404.1527(c)(2)(i)). If, after reviewing these factors, the ALJ chooses to reject or marginalize the treating physician's opinions, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." See Burgin v. Astrue, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting Halloran, 362 F.3d at 33).

Based on his conclusion that the treating physicians' opinions were unsupported by the objective evidence, the ALJ afforded "little weight" to the opinions of, among others, Drs. Drucker and Chapman. In reaching this conclusion, however, the ALJ failed to consider the frequency, nature, and extent of the physicians' relationship with Plaintiff or the fact that both are specialists in their respective fields. As noted above, Dr. Drucker had been treating Plaintiff on a nearly monthly basis for two years, while Dr. Chapman had treated Plaintiff roughly monthly for half a year in 2012. Dr. Drucker, who treated Plaintiff for his shoulder and lower back pain, is board certified in Physical Medicine and Rehabilitation, while Dr. Chapman—who also treated Plaintiff for his shoulder and lower-back pain—is board certified in Pain Management and Anesthesiology. Although the ALJ noted the elements of the record alleged to be inconsistent with the findings of Drs. Drucker and Chapman, and arguably considered the evidence in support of their findings,[7] the ALJ's failure to consider all the factors required by § 404.1527(d)(2) constitutes legal error and is also a ground for remand. See Clark v. Astrue, No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010); Ramos v. Comm'r of Soc. Sec., No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015). Indeed, in one breath, the ALJ discounted

---

[7] The ALJ recounts the findings of decreased range of motion, although he downplays the shoulder limitations as "mild[]." (R. at 38.) The ALJ further notes that "some" examinations showed positive straight-leg raising, but that this was "not shown consistently throughout the record," (id.), which, as noted above, does not accurately capture the weight of the clinical evidence in support of positive straight-leg raising.

the opinions of four providers who, together, treated Plaintiff dozens of times, in favor of the opinions of two consulting physicians who, together, saw Plaintiff only once. (R. at 38.) Nor does the ALJ distinguish between the four providers whose opinions he discredits, despite the fact that one is a physical therapist (Cardello), another a chiropractor (Guariglia), while the other two (Drs. Chapman and Drucker) are board-certified physicians, the latter of whom had a multi-year treatment relationship with Plaintiff. Such undifferentiated consideration of the opinions of treating physicians and other sources does not accord with the Commissioner's regulations and cannot provide the necessary "'good reasons' for the weight [the ALJ] gives to the treating source's opinion." Halloran, 362 F.3d 28, 32–33 (2d Cir. 2004).

Finally, having given little weight to the RFCs of Drs. Drucker and Chapman, which were the only RFCs on the record to properly account for Plaintiff's shoulder injury, the ALJ did not support his own RFC determinations regarding Plaintiff's use of his arm with any competent medical opinion. The determinations appear instead to have been based on the ALJ's interpretation of the raw medical evidence, which constituted reversible error. See Lowe v. Colvin, No. 15-CV-6077 (MAT), 2016 WL 624922, at *7 (W.D.N.Y. Feb. 17, 2016) ("Because Dr. Sheehan is the only medical opinion in the record to assess Plaintiff's ability to lift and carry with specificity, and because the ALJ ultimately gave little evidentiary weight to that opinion, the Court is 'left with the circumstance of the ALJ interpreting raw medical data to arrive at a residual functional capacity determination, without the benefit of an expert medical opinion.'" (quoting Tomford v. Comm'r of Soc. Sec., No. 13-CV-11140 (TGB), 2014 WL 764685, at *16 (E.D. Mich. Feb. 25, 2014))); Staggers v. Colvin, No. 14-CV-717 (JCH), 2015 WL 4751123, *2 (D. Conn. Aug. 11, 2015) ("[A]n ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."

(quoting Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010))). Likewise, having given little weight to the RFCs of Drs. Chapman and Drucker, and in light of the Court's conclusions that the reports by Drs. LeBeau and Govindaraj were inadequate, the ALJ failed to rely upon any adequate medical opinion to support his determination of Plaintiff's other functional capabilities. "By failing to support the RFC determination with proper expert medical evidence, the ALJ committed legal error." Hilsdorf, 724 F. Supp. 2d at 348.

## CONCLUSION

For the reasons set forth above, the Commissioner's cross-motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted. The ALJ's decision is reversed and the matter is remanded to the ALJ under the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.


SO ORDERED.

Dated: November *17*, 2017
      Brooklyn, New York

                                   s/Carol BagleyAmon

                                   Carol Bagley Amon
                                   United States District Judge